NEW JERSEY MISCELLANEOUS REPORTS. 871

N. J. Dept. Labor—Sochaska v. Balbach Smelting Co.

NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

VICTORIA SOCHASKA, PETITIONER, v. BALBACH SMELT-
ING COMPANY, RESPONDENT.

**Death—Lead Poisoning Alleged—Circumstances Peculiar and
Facts Reviewed at Length—Contention of Respondent That
Death was Result of Outbreak of Long-standing Disease Not
Established—Held, That the Death was Result of Lead
Poisoning.**

On determination and order.

For the petitioner, *Meyer M. Semel.*

For the respondent, *Edwin Kautzman.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

That the petitioner, Victoria Sochaska, is the widow and
administratrix *ad prosequendum* of the estate of Ludwig
Sochaska, deceased.

That the said Ludwig Sochaska, deceased, was employed
by the respondents, who were engaged in the business of
smelting and refining, in the city of Newark, and that the
deceased, in his lifetime, was first employed by the respond-
ents some time during 1906, at which time he was engaged
as operator of a blast furnace, which occupation the decedent
did pursue for and as employe of the respondents until Janu-
ary, 1914, when he was transferred to the yard division.
His employment in the yard consisted of the breaking up
with a hammer of metallic bodies weighing about two hun-
dred and fifty pounds each and called copper mattes, which
mattes in turn were composed of sulphide of copper, lead,
iron, gold and silver. These mattes the decedent broke up
with a hammer into small pieces, which small pieces were
stacked up in piles or thrown into piles by the decedent after
the same were broken up.

I do find also that these capper mattes contained from
ten per cent. to fifteen per cent. of lead, the percentage of
which varied.

I do also find that the decedent was transferred from the blast furnace to the yard division in 1914 because he became affected with a condition of the wrists, and that the superintendent thought it advisable to put him in the yard.

Respondents contend that deceased contracted lead poisoning at that time, which became chronic and which caused his death in March of 1925. There is a likelihood that decedent did contract lead poisoning in some form at that time. There is no medical testimony, however, from which this can be established, and particularly that it was chronic and was responsible for his death as they contend.

I find from the testimony of the superintendent, Mr. Zahn, that the decedent worked continually in the yard breaking copper mattes until about September 10th, 1922, when he ceased his employment with the respondents, but returned to the same on the 28th day of May, 1923, when he was put back to work on the same job.

I do also find from the testimony of the said superintendent that the wrist drops had improved and that the decedent was able to use both hands in the breaking up of the mattes and piling them, and that by the 21st day of January, 1925, there was such a decided improvement in the wrists that the decedent had practically the full functionary powers of his wrists and hands, which to my mind indicated also a decided improvement of any lead poisoning condition to which he may previously have been subjected. This conclusion is further evidenced by the fact that until the 21st day of January, 1925, the decedent worked continually and steadily for the respondents, losing no time from work by reason of any illness.

I do further find that on the 21st day of January, 1925, the decedent suddenly became very ill and was caught by a fellow-employe as he was apparently fainting. The testimony of Louis Dickson, a fellow-employe, shows that the said Louis Dickson was standing about three feet from the decedent; that the decedent called to him and that when the said Louis Dickson looked at the decedent he saw that there was something the matter and that the decedent was

going to fall. Decedent's eyes were red and the said Louis Dickson caught him before he fell and carried him into the yard.

The testimony of the superintendent, Mr. Zahn, shows that the decedent was lying on the ground and frothing at the mouth, and that because the man appeared to be very ill, the superintendent caused the decedent to be sent home in the private bus of the respondents.

I do find further, that from the 21st day of January, 1925, until the 22d day of March, 1925, the decedent was confined to his bed and home, and that on the 22d day of March, 1925, decedent died. The only testimony adduced at the trial and from which I could arrive at the cause of the decedent's death was that of Dr. Saul Rubinow, who attended the decedent during his last illness, and who testified that he treated the decedent for the first time on January 21st, 1925, at his home, where he found the decedent suffering from an abdominal pain, colic, general weakness and constipation, which were the symptoms decedent gave him. He found decedent to be very pale, with a typical pallor of his face, and that upon seeking to find the cause for his abdominal colic, he found the man had a blue line around the gums. In addition thereto, there was weakness and a tremor of his muscles, constipation without temperature. From these symptoms Dr. Rubinow diagnosed the case as that of acute lead poisoning. He continued to treat the man and found from further examinations and diagnoses that the condition was acute, and that the poison condition had existed a few weeks; that he made a urine test and found albumen in the urine; that he caused to be made a blood test and found a low hemoglobin of the blood. That he treated the man until the man died, during which time the doctor observed that decedent's condition became gradually worse, and that the man died of nephritis, or Bright's disease, which was brought about and was due to lead poisoning.

I find from the testimony of the petitioner, Victoria Sochaska, and from the superintendent, Mr. Zahn, that the decedent enjoyed good health and worked steadily from 1914

until January, 1925, when he received the above attack, and that during that time he had not lost any time from his work by reason of sickness.

I also find that there is no evidence from which the death of decedent can be attributed to any other condition, disease or injury.

I am especially impressed by the testimony of Dr. Flachs and Dr. Fowler, medical experts who were produced by the respondents and who both testified that from the hypothetical questions submitted to them the man very likely died from exposure to lead, which exposure very likely occurred within five months of the date of his death by reason of the fact that his death occurred about two months from the time when he became ill.

From the testimony of Mr. Zahn, Mr. Dickson and Mr. Pfennig, witnesses produced by the respondents, it is very evident that the decedent was working under conditions which ordinarily would not have subjected him to any danger-ous exposure to lead. While there is no testimony to establish the fact itself, the medical testimony adduced by both peti-tioner and respondents shows beyond any question of doubt that the decedent died as a result of an acute condition of lead poisoning termed by the doctors as an exaserbation due to a severe exposure a short time prior to his death.

I am therefore forced to the conclusion that in the course of his work of breaking up the mattes and handling the pieces and from the other conditions under which he worked at the plant of the respondents, he undoubtedly became exposed in such manner to lead poisoning that either by inhalation or absorption he received into his system lead in such quantities, within a period of five months of his death, that his illness resulted therefrom in January, 1925, and which led to his death in March of the same year. This fact becomes more decisive in view of the testimony of the physicians who testi-fied that if the man had continued to work under the same conditions which he had worked under from 1914 to January, 1925, that he could have continued to work under those con-ditions indeterminately and without becoming exposed to any

harmful degree of lead, unless a great or intensive exposure occurred which alone would bring about his illness and death, as it, in fact, occurred.

The respondents laid great stress upon the fact that the decedent died from an exaserbation of a *chronic condition* which they claim existed from 1914 and prior thereto. The respondents have not, however, been able to account satisfactorily for the fact that, assuming that the man in 1914 and prior thereto had lead poisoning, that after being shifted to the yard division, his condition generally and continually improved, and that by 1924 his condition had so improved that he almost had the full function of his wrists and hand. To my mind, such an improvement in the wrists and hands would indicate a decisive improvement in his general condition, and the lessening, if not entire elimination, of any lead poisoning condition which may have existed in him in 1914 and prior thereto. That the man should be improving continually and then suddenly become seriously ill and die about two months thereafter from a condition, the symptoms of which indicates clearly an acute condition of lead poisoning, indicates to my mind without any question of doubt that the decedent died from an extraordinary or intensive exposure to lead poisoning which occurred within five months of the date of his illness and death.

And I do so find that the decedent has, in the course of his employment, been exposed to lead, which exposure arose out of and in the course of his employment and brought about his death within a period of five months or less of the date of his death.

I do further find that the petitioner is entitled to temporary compensation for herself and the five children from the 21st day of January, 1925, to the 22d day of March, 1925, to wit, eight and four-sevenths weeks, at $16.67 per week, being $142.88.

I do further find that the petitioner is entitled to permanent compensation from the 22d day of March, 1925, for two hundred and seventy-four and four-sevenths weeks, at $13.75 per week, being $3,775.35.

. I do further find that the petitioner is entitled to twenty-five and three-sevenths weeks' permanent, at $12.50 per week, being $317.85.

I do further find that the petitioner is entitled to one hundred and sixty-one and one-seventh weeks' permanent, at $11.25 per week, being $1,812.85.

I do further find that the petitioner is entitled to eighty-eight and six sevenths weeks' permanent, at $10 per week, being $888.57.

I do further find that the petitioner is entitled to two hundred and forty-three weeks' permanent, at $8.75 per week, being $2,126.25.

I do further find that there is due to the petitioner the sum of $150 for funeral expenses incurred for the burial of the decedent, and the further sum of $30 for medical expenses incurred in the care and treatment of the decedent in his last illness.

I do further find that there is due the petitioner the sum of $5, being the costs expended for obtaining letters of administration *ad prosequendum*, and the further sum of $25 for stenographic fees incurred in the hearing of the within matter.

I do further find that there is due the petitioner the sum of $100, being expense incurred for medical expert testimony in the hearing of the within matter.

I do order the respondent to pay to Meyer M. Semel, attorney for the petitioner, the sum of $375 as and for his counsel fee in the within matter.

I do further order the petitioner to pay unto Meyer M. Semel the further sum of $375 as and for his counsel fee, which shall be paid out of accrued compensation due to the petitioner.

HARRY J. GOAS,<br>
*Deputy Commissioner.*